Argued and submitted April 9, affirmed October 22, 2003

# M+W ZANDER, U.S. OPERATIONS, INC.,
formerly known as,
Meissner + Wurst, U.S. Operations, Inc.,
a Delaware corporation,
*Appellant,*

*v.*

## SCOTT CO. OF CALIFORNIA,
a California corporation,
*Respondent.*

16-01-16540; A118145

78 P3d 118

Thomas A. Larkin argued the cause for appellant. With him on the briefs were Arnold L. Gray, Angela M. Otto, and Stewart Sokol & Gray, LLC.

Kevin P. Donnelly argued the cause for respondent. With him on the brief was Dann & Meacham.

Before Edmonds, Presiding Judge, and Deits, Chief Judge, and Schuman, Judge.

SCHUMAN, J.

## SCHUMAN, J.

Defendant Scott Company (Scott) ordered equipment from plaintiff M+W Zander, U.S. Operations, Inc. (M+W) for use by Scott in a construction project in Eugene. The parties effected the transaction by a purchase order and a later-issued supplemental purchase order both issued by Scott and accepted by M+W. M+W brought this action alleging that Scott breached the contract formed by the purchase orders. Scott moved for summary judgment under the theory that M+W's action was time barred. The trial court granted Scott's motion, and M+W appeals. Concluding that there is no genuine issue of material fact and that Scott, the moving party, was entitled to judgment as a matter of law, ORCP 47 C, we affirm.

The following facts are not in dispute. The original purchase order from Scott contained, among other things, specifications of the goods M+W was to supply (26 tower fan air handling systems), a date by which their delivery was to be complete (November 7, 1996), and a price ($1,073,502). Delivery was not timely, and, when it did occur, Scott was not satisfied with the condition of the goods. Negotiations ensued. The parties agreed that Scott could deduct $162,378 from the original purchase price to compensate for the additional costs that Scott had incurred due to the fans' defects. On April 24, 1997, Scott issued a supplemental purchase order reflecting the reduced price. On June 26, M+W applied the requested discount to Scott's account and billed Scott for the reduced amount ($911,124). Scott made partial payments on August 8 and September 29, 1997, but left a balance of $300,000 owing to M+W. On August 24, 2001, M+W's demands for payment of the balance remained unmet, and M+W filed this action for breach of contract, *quantum meruit* for goods sold and delivered, and account stated. The trial court granted Scott's motion for summary judgment, concluding that M+W had not filed its action within the statute of limitations.

The parties agree that, under the applicable law, the limitations period for an alleged breach of contract for the sale of goods is four years from the date on which the contract

is breached. According to M+W, the supplemental purchase order was an offer by Scott to pay the reduced price for the equipment within 45 days of M+W's acceptance, and that acceptance occurred only when M+W signed the supplemental purchase order and returned it to Scott on August 7, 1997. Thus, Scott's payment became due 45 days later, that is, on September 21, 1997. That being the case, M+W concludes, the limitation period elapsed on September 21, 2001, so M+W's August 24, 2001, filing was timely. In the alternative, M+W argues that, under Oregon law, Scott's partial payments on August 15 and September 29, 1997, began a new four-year limitation period, which expired on September 29, 2001, again compelling the conclusion that the August 24, 2001, filing was timely.

Scott, for its part, contends that the supplemental purchase order specified that Scott's payment was due 45 days from the date Scott issued the purchase order, not 45 days from M+W's written acceptance of it. The date of issue was April 24, 1997; 45 days elapsed on June 9, 1997. Further, Scott maintains, California's law, not Oregon's, applies, and under California law partial payment does not toll the running of the limitation period; thus, according to Scott, it was in breach, the action against it accrued, and the limitation period began on June 9, 1997, and elapsed on June 9, 2001. Therefore M+W's August 24, 2001, filing was not timely.

We conclude that California law applies. Under that law, M+W accepted the offer made by Scott in the supplemental purchase order when it applied the discount that order contained to Scott's account on June 26, 1997. Under the terms of the purchase order, Scott's payment was therefore due 45 days later, on August 10, 1997. When Scott had not made payment on that date, it breached, and the cause of action against it accrued. Because California law applies, nothing tolled the limitation period; therefore it lapsed at the close of business on August 10, 2001. The trial court therefore did not err in concluding that M+W's action was untimely.

## I.  CHOICE OF LAW

Although the parties disagree about which state's law applies, they agree that their contract's choice of law provision is the basis on which that dispute must be determined.

When parties specify their choice of law in a contract, that choice will be effectuated subject to the limitations in section 187(2) of the *Restatement (Second) of Conflict of Laws* (1971).[1] *Machado-Miller v. Mersereau & Shannon, LLP*, 180 Or App 586, 592, 43 P3d 1207 (2002). That *Restatement* section provides:

> "The law of the state chosen by the parties to govern their contractual rights and duties will be applied * * * unless * * *

> "(a)   the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

> "(b)   application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which * * * would be the state of the applicable law in the absence of an effective choice of law by the parties."

Here, the construction project took place in Eugene, Oregon, and both companies are licensed to do business in Oregon. Scott is a California corporation headquartered in California. The disputed issues involve general rules of contract law that do not implicate either state's "fundamental policy," nor does either state have a "materially greater interest" than the other in the disputed issues. We therefore agree with the parties that their contractual choice of law should be given effect.

■       In interpreting the contract, we begin with the text and context; proceed to extrinsic evidence of the parties' intent if the text and context do not resolve all ambiguities; and, if ambiguity remains after the second step, resort to maxims of construction. *Yogman v. Parrott*, 325 Or 358, 361-64, 937 P2d 1019 (1997).

---

[1] In 2001, the Legislative Assembly, adopting a proposal of the Oregon Law Commission, codified the state's choice of law for contracts, and the statutes took effect January 1, 2002. *See* ORS 81.100 - 81.135. Those statutes do not apply to actions commenced before the effective date of the Act. Or Laws 2001, ch 164, § 11. This action was commenced before the effective date of the Act.

In order to avoid problems of infinite regress, we apply Oregon choice of law rules to determine whether Oregon's or another state's law applies.

■   The supplemental purchase order that the parties agree forms the contract in this case contains typewritten terms on the front and a page of preprinted terms on the back. The original purchase order likewise has a typewritten front and the same preprinted terms on the back. One of the preprinted terms, paragraph 13, states, in part, "The definition of terms used, interpretation of this agreement and the right of all parties hereunder shall be construed under and governed by the laws of the State of California." That term, standing alone, is unambiguous. However, paragraph 11 of the same page of terms and conditions provides:

> "In the event that the goods and services purchased hereunder are ordered in connection with Buyer's performance of a prime or subcontract and specifications and drawings applicable thereto and such price [*sic*] or subcontract and specifications and drawings are referred to on the face of this purchase order or in Seller's quotation, confirmation or acknowledgment, Seller agrees to deliver such goods and perform such services in full compliance with all the requirements of such prime or subcontract and specifications and drawings. All terms and conditions applicable to the goods and services purchased hereunder, in such prime or subcontract and specifications and drawings, including but not limited to warranties and guarantees, time of performance and remedies for breach, are hereby incorporated by reference into this purchase order and made applicable to and undertaken by Seller for the benefit of Buyer."

M+W argues that this "flow-down" provision incorporates by reference the choice of law term of Scott's subcontract with the general contractor, the "upstream" contract. That contract, in turn, contains the following preprinted term: "This Agreement shall be governed by the laws of the State in which the Project is located." According to M+W, paragraph 11 makes the contract ambiguous because it contains terms that conflict with the terms of paragraph 13, and that the ambiguity should be resolved in favor of paragraph 11. We disagree.

M+W's interpretation focuses on the second sentence of paragraph 11. In isolation, that sentence states that the terms of the upstream contract that are "applicable to" the fan towers or services incidental to their installation—

including terms regarding remedies for breach—are incorporated into the purchase order. One of those terms, according to M+W, is the choice of law provision. However, the second sentence cannot be read in isolation. In context, it clearly elaborates on and explains the first sentence, which applies only if the upstream contract "and specifications and drawings are referred to on the face of this purchase order." The better reading of the entire paragraph, then, is that the incorporation of terms from the upstream contract occurs only if that contract is "referred to on the face of this purchase order." In other words, a condition precedent for incorporation of the upstream contract's terms into the purchase order is reference to the upstream contract on the face of the purchase order. In fact, the face of the purchase order refers to some specifications for the fan towers, but it does not refer to any contract between Scott and any other entity.

Even if paragraph 11 of the purchase order could be read to incorporate the upstream contract's choice of law provision, thereby creating a conflict between paragraphs 11 and 13, that conflict would be resolved in favor of paragraph 13. Paragraph 13 states in clear terms immediately present before the purchase order's author (Scott) and acknowledger (M+W) that California law applies. Paragraph 11, on the other hand, indirectly refers to a term from a contract neither party can be assumed to have before it when the offer and acceptance occurred.

Further, presuming that neither of those textual arguments resolves the dispute, and in the absence of any nontextual indications of the parties' intentions, the statutory maxim of construction in ORS 42.240 applies:

> "In the construction of an instrument the intention of the parties is to be pursued if possible; and when a general and particular provision are inconsistent, the latter is paramount to the former. So a particular intent shall control a general one that is inconsistent with it."

Paragraph 11 indirectly incorporates a general provision: "This agreement shall be governed by the laws of the State in which the Project is located." Paragraph 13 is direct and specific: "The definition of terms used, interpretation of this agreement and the right of all parties hereunder shall be

construed under and governed by the laws of the State of California." Thus, paragraph 11 refers to "this agreement" while paragraph 13 refers to specific aspects of the agreement (definition of terms, interpretation, etc.); paragraph 11 refers generically to "the State in which the Project is located" while paragraph 13 specifically names California. We conclude that the parties chose California law.

## II.  DATE OF BREACH

As noted above, M+W contends that Scott's obligation to pay for the goods (and, consequently, its breach of contract and the beginning of the limitations period) occurred on September 21, 1997, 45 days after M+W accepted the supplemental purchase order by signing it and returning it to Scott. Scott contends that its obligation occurred on June 9, 1997, 45 days after Scott issued the purchase order.

The supplemental purchase order, like the original, contains the phrase "net 45 days." The parties do not agree about what this phrase means. It is not defined by statute. Scott, citing cases from other states, argues that it means payment is due 45 days after either the date the buyer receives the goods or after the date of the invoice. *Valley Timber Sales, Inc. v. Midway Forest Products, Inc.*, 563 So 2d 612, 614 (Ala App 1990) ("net 11 days" means payment due within 11 days of invoice); *Watson v. Cargill, Inc., Nutrena Div.*, 573 SW2d 35, 40 (Tex App 1978), *writ refused, no reversible error* (1979) ("net 30 days" means payment due 30 days after delivery). M+W simply states that the phrase means that "the parties agreed that payment was due within 'NET 45 days' of M+W's acceptance of Supplement #1," that is, of the supplemental purchase order.

Scott's Texas and Alabama cases, although obviously not conclusive or binding, create at least the suggestion that the term "net 45" means "payment due within 45 days of delivery or invoice." M+W offers nothing to rebut that suggestion, either from statutes, case law, or the evidence in the record of this case. We are therefore inclined to accept Scott's reading. However, we need not do so, because even if M+W is correct that the term indicates that payment was due 45 days after M+W's acceptance, that date is not September 21, 1997,

45 days after the signed acknowledgment, as M+W contends, but (at the latest) on August 11, 1997, 45 days after M+W applied the discount contained in the supplemental purchase order to Scott's account.

Contrary to its argument, M+W was not required by the terms of the supplemental purchase order to accept it in writing. Section 2206 of the California Commercial Code provides, in part:

> "(1)    Unless otherwise *unambiguously* indicated by the language or circumstances
>
> "(a)    An *offer to make a contract shall be construed as inviting* acceptance in any manner and by any medium reasonable in the circumstances[.]"

(Emphasis added.) The supplemental purchase order *requests* written acknowledgment by M+W, stating, "Acknowledgment copy attached please sign reverse side and return within ten days * * *." The request for a written acknowledgment was not stated in mandatory terms. Thus, written acknowledgment is not *unambiguously* a term or condition of the purchase order. That being the case, acceptance could be made by any reasonable means in the circumstances.

Both the original and supplemental purchase orders contain the following language: "Seller's acceptance of this purchase order is limited to the terms and conditions hereof, and written confirmation, commencing performance, or making deliveries hereunder constitutes such acceptance * * *." The parties characterize the course of dealings in this case as consisting of an original contract (the first purchase order describing the goods and services to be purchased and listing their price) and a modification (the second purchase order, reducing the price to reflect the discount resulting from Scott's expenses in making the goods conform to specifications). *See* Cal Com Code § 2717 (buyer entitled, on notification to seller, to deduct for damages resulting from breach). Under the contract terms, then, M+W commenced performance of the original contract when it began to deliver goods, and it commenced performance of the modification when it applied the requested discount to Scott's account on June 26,

1997. On that date, the contract, as modified, was fully formed; under M+W's own theory of what "net 45 days" means, Scott's payment was due on August 11, 1997; and Scott's failure to pay on that date put it in breach, thereby beginning the limitations period.

## III.   THE EFFECT OF SCOTT'S PARTIAL PAYMENT

■■   M+W cites *Northwest Fndry v. Willamette Mfg.*, 268 Or 343, 356, 521 P2d 545 (1974), for the proposition that partial payment of an amount due under a contract begins a new limitation period. *See also* ORS 12.240. However, as we have decided, California law applies and, under the well-settled law of that state, partial payment generally does not start a new statutory limitations period. *Heinlin v. Castro*, 22 Cal 100 (1863). M+W nonetheless maintains that Scott's partial payment falls within an exception to this general rule, codified as section 360 of the California Code of Civil Procedure:

> "No acknowledgment or promise is sufficient evidence of a new or continuing contract, by which to take the case out of the operation of this title, unless the same is contained in some writing, signed by the party to be charged thereby, provided that *any payment on account of principal or interest due on a promissory note made by the party to be charged shall be deemed a sufficient acknowledgment or promise of a continuing contract to stop, from time to time as any such payment is made, the running of the time within which an action may be commenced upon the principal sum or upon any installment of principal or interest due on such note, and to start the running of a new period of time,* but no such payment of itself shall revive a cause of action once barred."

(Emphasis added.) M+W argues that, on November 7, 1997, Scott sent a letter indicating that some of the equipment that Scott purchased from M+W was in unacceptable condition. The letter concludes with the following sentence:

> "Scott Co. has released $200,000 to our material supplie[r] Meissner+Wurst which was on hold and will release the balance of the purchase order funds if Meissner+Wurst/ Marshall acknowledges that the delay of the installation of the coils and piping acceleration costs were *not* due to the late design of the seismic braces for the Tower Fan units."

(Emphasis in original.) As the letter indicates, Meissner+Wurst/Marshall is not the same entity as M+W (Meissner+Wurst/Zander, U.S. Operations, Inc.) and is not a party in this case. In fact, Meissner+Wurst/Marshall, a joint venture of which M+W was apparently one member, was the general contractor with which Scott had its upstream contract to install the tower fans purchased from M+W. In the quoted letter, Scott is apparently telling the upstream contractor that it will release the funds Scott owes to one of that contractor's member entities, M+W, if the upstream contractor makes a concession.

■      In order for a communication to constitute a valid acknowledgment under section 360, assuming (without deciding) that the section applies to open accounts, the communication must meet four criteria: (1) it must be communicated to the creditor; (2) it must be a direct, distinct, unqualified, and unconditional admission of the debt; (3) it must indicate that the party is liable for the debt and willing to pay it; and (4) it must not contain any intimation of an intent to refuse payment of the debt. *Clunin v. First Federal Trust Co.*, 189 Cal 248, 250-52, 207 P 1009, 1010 (1922) (construing original 1872 version of statute; proviso added in 1947 and amended in 1955); *see also Searles v. Gonzalez*, 191 Cal 426, 430, 216 P 1003, 1004 (1923) (acknowledgment must treat "indebtedness as subsisting and one which the debtor is liable and willing to pay"); *Kurokawa v. Blum*, 199 Cal App 3d 976, 245 Cal Rptr 463, 471 (1988) (acknowledgment must be in writing); *Buescher v. Lastar*, 61 Cal App 3d 73, 75-76, 132 Cal Rptr 124, 125-26 (1976) (acknowledgment must be unequivocal, containing no new terms or conditions).

In this case, the letter was not directed to the creditor; rather, it was directed to a third party, albeit a related one. More obviously, the letter does not contain "a direct, distinct, unqualified and unconditional" admission of the debt. It states that Scott has released $200,000, which had previously been "on hold," to M+W. It goes on to say that "the balance of the purchase order funds" will be paid if M+W/M meets certain conditions. M+W itself characterizes that as a "conditional promise" to pay. Thus, Scott's statements do not meet the third and fourth requirements for an acknowledgment. They do not indicate that Scott is willing to pay the

debt; rather, they indicate an intent to refuse to pay the debt unless certain conditions are met by a company that is not directly a party to the contract. The letter therefore does not meet the criteria for an acknowledgment under the rule.

In sum, we hold that, under applicable law, the terms of the contract between Scott and M+W required Scott to make full payment within 45 days of M+W's acceptance of the discounted price contained in the supplemental purchase order and that M+W accepted that price, at the latest, when it applied the discount to Scott's account on June 26, 1997. Thus, Scott's payment was due on August 10, 1997. When Scott had not made payment on that date, it breached, and the cause of action against it accrued. Nothing tolled the limitations period, which expired at the close of business on August 10, 2001. The trial court did not err in concluding that M+W's action was untimely.[2]

Affirmed.

---

[2] Our conclusion that M+W cannot now litigate to collect the alleged outstanding $300,000 balance makes it unnecessary for us to address M+W's second assignment of error: that the court erred in denying M+W's motion for summary judgment against Scott's defenses that would have reduced the amount of the debt had we decided that M+W still had a valid claim for it.