# Frederick S. MAGILL,
*Appellant,*

*v.*

# Benjamin Ira SCHWARTZ,
*Respondent.*

## 99-2200; A110704

105 P3d 867

Billy M. Sime argued the cause for appellant. With him on the briefs was Parks, Bauer, Sime, Winkler & Fernety LLP.

Frank H. Hilton, Jr., argued the cause for respondent. With him on the brief were Brian Talcott and Dunn Carney Allen Higgins & Tongue LLP.

Before Landau, Presiding Judge, and Brewer, Chief Judge, and Armstrong, Judge.

ARMSTRONG, J.

## ARMSTRONG, J.

Plaintiff appeals from a foreclosure judgment. Plaintiff's sole assignment of error is that the trial court erred in ruling that a loan extension agreement between the parties was not definite enough to be specifically enforced. We affirm.

Defendant made an unsecured loan of $20,000 to Baypack Fisheries, LLC, a company in which plaintiff owned a 24 percent interest and in which defendant owned about a three percent interest. Shortly thereafter, defendant offered to loan an additional $500,000 to Baypack Fisheries. Having committed to look out for defendant's best interests after defendant suffered a severe head injury and received a multi-million dollar settlement, plaintiff offered his own property as collateral for the loans.

In January 1996, the parties drew up a loan agreement, a promissory note, and a deed of trust. The agreement provided that, as security for the $520,000, plaintiff would give defendant a mortgage on property that plaintiff owned in Cannon Beach and security interests in one of plaintiff's fishing vessels and his airplane. The loan agreement also provided that the loan was payable on or before January 1997; that the loan was for a commercial purpose so that plaintiff could, in turn, lend the money to Baypack Fisheries; and that the loan would be governed by the laws of the State of Washington. The promissory note provided that the due date could be extended by mutual consent. Both parties envisioned that Baypack Fisheries would be the source for repayment of the loan.

However, that spring Baypack Fisheries experienced severe financial difficulties that it blamed on a fish-marketing company, Nelbro, with which it had contracted. In fall 1996, Baypack Fisheries filed an action against Nelbro for breach of contract and tortious interference with contract.

As a result of Baypack Fisheries's financial difficulties, plaintiff was unable to repay defendant by the January 1997 deadline. In February 1997, plaintiff and defendant reached an agreement to establish a new payment schedule.

Under the terms of that agreement, plaintiff was to convey to defendant title to plaintiff's real property in Cannon Beach. Defendant would credit plaintiff $200,000 towards the balance due and would develop and sell the Cannon Beach property. Defendant would also credit to plaintiff any amount defendant received for the property in excess of $200,000 and would pay to plaintiff any amount of the net profits that exceeded the amount plaintiff owed on the promissory note. Defendant also agreed that he would not initiate any collection action on the promissory note until he had developed and sold the Cannon Beach property. In accordance with that agreement, plaintiff gave defendant a warranty deed to his property in Cannon Beach. The parties now stipulate that the warranty deed was in fact an equitable mortgage.

In 1998, plaintiff learned that defendant had entered into a contract to sell the Cannon Beach property for $250,000, far less than plaintiff believed the property to be worth. Plaintiff filed an action to enjoin the sale. Defendant filed a counterclaim in the action, seeking to foreclose the mortgage on the Cannon Beach property due to plaintiff's breach of the loan agreement and promissory note.

On August 24, 1998, plaintiff's attorney sent a settlement offer to defendant's attorney. On August 26, 1998, defendant's attorney faxed to plaintiff's attorney a document consisting of a fax cover sheet and a marked-up copy of plaintiff's settlement offer. On the cover sheet, defendant's attorney wrote:

> "Enclosed is a copy of [your] August 24, 1998 letter that I have marked to show those matters on which we have agreement and those few other matters where we would be in agreement with minor modifications. Please review with your client and call me. The details of some of these matters will need to be worked out, but I think this letter should serve as a good outline. I note that there are other matters, previously addressed, such as the stand-still agreement, that will need to be incorporated into the final document."

On August 27, 1998, plaintiff's attorney sent a letter to defendant's attorney purporting to accept defendant's counteroffer. That series of documents is the settlement agreement that plaintiff seeks to specifically enforce as a defense to

defendant's attempt to foreclose the mortgage on the Cannon Beach property.[1]

As modified by defendant's attorney, the purported settlement agreement contained the following terms:

"1.   Cannon Beach Property

"[Defendant] would transfer the property back to [plaintiff] and would take a deed of trust on the property, with a due on sale clause. [Plaintiff] would then be responsible for the back taxes owed and for the actual invoiced cost of the geotechnical work-up on the property which would be added to the principal balance of the note. Any attorneys' fees incurred by [defendant] specifically in connection with efforts to develop and sell the property would be reimbursed by [plaintiff], upon confirmation of the nature of the services rendered from time entries, also by adding to the loan balance. He would have until the end of the forbearance agreement (30 days after final resolution of the Baypack v. Nelbro action, including any appeals) to obtain at his cost and expense engineering and geologic recommendations, building permits, etc. and/or to obtain a binding purchase and sale agreement from a qualified buyer through a realtor of his choice. [Plaintiff's] proposal with respect to the above is conditioned upon confirmation that the re-conveyance of the property under these circumstances would not be deemed a sale for purposes of the listing agreement between [defendant] and his realtor, which is also a condition of [defendant].

"2.   [FISHING VESSEL] SANDMAN

"[Defendant] would agree not to foreclose on the first preferred mortgage he holds on the vessel until default under the note. [Plaintiff] would be free to sell the vessel at any time prior to that date, the first $150,000.00 of which would be paid to [defendant] in satisfaction of his mortgage[,] to a disinterested third party. Any sale of the vessel by [plaintiff] on terms would include the usual protections for a mortgagee, such as an assignment of sale proceeds,

---

[1] Plaintiff's initial action was dismissed without prejudice when it appeared that the parties had reached another settlement in early 1999. That settlement also ultimately failed, and plaintiff refiled his action to enjoin the sale of the Cannon Beach property. Defendant filed a counterclaim for judicial foreclosure of the mortgage, and plaintiff raised the August 1998 purported settlement as a defense to the foreclosure.

naming [defendant] as a loss payee on the vessel's hull and machinery policy, etc. In the event of any sale on terms the mortgage shall remain a lien on the vessel until first $150,000 paid, unless otherwise agreed by [defendant].

"3.  Petersburg Property

"[Plaintiff] would grant to [defendant] a deed of trust on Lot 8, with a due on sale clause.

"4.  Baypack v. Nelbro Chose in Action

"[Plaintiff] would grant to [defendant] a security interest in his right to any recovery in the above-referenced action, and will warrant that right has not been assigned, pledged, etc.

"5.  Loan Extension Fee

"In consideration of the above, [plaintiff] would pay a loan extension fee of $25,000.00, which would be added to the principal balance of the Note.

"6.  [Plaintiff] to pay attorney's fees and costs of [defendant] in connection with loan modification, restructuring * * *, provided that fees under 1. and 6. not to exceed $12,500, to be added to Note balance.

"7.  The Promissory Note

"The promissory note would be modified to reflect the new maturity date, as indicated above, and the new principal loan balance, which would include the $25,000.00 loan extension fee. Also modified to confirm cross-collateralization and that default under any security instrument is default under Note."

The parties' attempts to memorialize the purported settlement agreement in a more formal and detailed document failed miserably. Plaintiff insists that defendant's attorneys repeatedly attempted to force him to accept terms that were not part of the original agreement, such as an increase in the interest rate on the note. Defendant insists that plaintiff rejected his attempts to memorialize the agreement without ever specifying what the points of disagreement were.

For our purposes, the most important disagreement between the parties arose over the security interest that

plaintiff was to grant defendant in the proceeds of the litigation between Baypack Fisheries and Nelbro (Nelbro litigation). According to defendant, after the exchange of documents that constitute the settlement agreement, he learned that plaintiff was not in fact a party to that litigation. Thus, defendant wanted a security interest in plaintiff's membership in Baypack Fisheries, LLC, as well as in his shares of Professional Fisherman's Association, Inc., a corporation that itself was a member of Baypack Fisheries. Plaintiff refused to grant defendant such an interest and instructed his attorneys to add the existence of the settlement agreement as an affirmative defense to defendant's counterclaim seeking judicial foreclosure.

After a bench trial, the court held that the parties had reached a general agreement to extend the term of the loan but disagreed on material terms. Those disagreements, in the view of the trial court, rendered whatever agreement the parties had reached incapable of specific performance.

The court focused on two terms on which the parties disagreed. First, the court held that it could not enforce the settlement agreement without drafting a security agreement, and the parties disagreed as to the form of the security interest that would be the subject of that agreement. Second, the court held that the parties' disagreement over whether plaintiff had to provide title insurance along with trust deeds on the Cannon Beach and Petersburg, Alaska, properties made the purported loan extension agreement incapable of specific performance. Thus, the court held that the settlement agreement was not a defense to defendant's counterclaim for judicial foreclosure and entered the judgment from which plaintiff appeals.

This action is in effect an action for specific performance of a contract and thus is equitable in nature. Our standard of review is *de novo*; we shall try the cause anew upon the record. ORS 19.415(3) (2001). The underlying loan agreement states that the agreement between the parties shall be governed by the law of the State of Washington, and both parties agree on this point. Thus, we apply Washington law. *M+W Zander v. Scott Co. of California*, 190 Or App 268, 272, 78 P3d 118 (2003).

■   As discussed above, the trial court held that the parties disagreed as to material terms of the settlement agreement—specifically, the form of the security interest in plaintiff's rights to the proceeds from the Nelbro litigation and the question of title insurance on the trust deeds—and concluded that the agreement therefore could not be specifically enforced. We agree that the settlement cannot be specifically enforced, but for a different reason. As we see it, even assuming that the parties agreed on the material terms of the settlement, plaintiff was not able to perform his obligation under the agreement at any relevant time. Hence, he cannot seek specific performance of the agreement. Plaintiff could not perform for the simple reason that, as defendant pointed out to the trial court, plaintiff had no rights in the collateral in which he promised to give defendant a security interest.

The settlement agreement provided that "[plaintiff] would grant to [defendant] a security interest in his right to any recovery in the [Nelbro litigation], and will warrant that right has not been assigned, pledged, etc." It is clear that the parties intended this to be an enforceable security interest, as it was intended to secure a large and growing debt. Regarding the discussions that led to the agreement, one of defendant's attorneys testified at trial that

"[*Nelbro*] was the deal. I mean, that was the whole reason. If [*Nelbro*] hadn't been out there as a, you know, possible source of payment, I don't think we would have even had these discussions. Everybody was expecting to get paid out of the [*Nelbro*]. * * * Without that there, I think we all were up the creek."

As discussed below, plaintiff still maintains that he can grant an enforceable security interest to defendant. Thus, both parties intended for the security interest to be enforceable.

Under Washington law, a security interest does not attach and is not enforceable until the debtor has rights in the collateral. Revised Code of Washington (RCW) 62A.9A-203. Because the settlement agreement contemplated an enforceable security interest, it contemplated that plaintiff actually had rights in the collateral, that is, "his right to any recovery" in the Nelbro litigation. However, plaintiff had no

right to any recovery in that litigation and thus could not grant to defendant an enforceable security interest.

Plaintiff insists that all he had to do to perform his promise to provide a security interest was to sign and file a Uniform Commercial Code financing statement granting defendant a security interest in his right to any recovery from the Nelbro litigation. At trial, plaintiff's attorney testified that, as a member of the limited liability company that was a party to the litigation and as a creditor of that same company, plaintiff had an expectancy in the proceeds of the litigation that was a "general intangible" under the law of secured transactions. However, because plaintiff himself was not a party to the litigation, he had no rights in the proceeds of the litigation at all.

Baypack Fisheries, LLC, is a Washington limited liability company, and, under Washington law, a member of a limited liability company "has no interest in specific limited liability company property." RCW 25.15.245. Thus, plaintiff's status as a member of the limited liability company gave him no rights in the proceeds of the litigation.

Plaintiff's status as a creditor is no help to him either, for it gave him no vested interest in any particular asset of the company. One of his attorneys testified at trial that plaintiff had promissory notes from the company, evidencing the company's debt to him. Those notes are not in the record. Even assuming their existence, nothing in the record indicates that those notes were secured by any particular collateral, such as the proceeds from the Nelbro litigation. Thus, the notes do not show that plaintiff had any right to the proceeds of that litigation. For plaintiff to pledge those notes as security for his debt to defendant would be to offer defendant materially different collateral from that promised in the settlement agreement.

Plaintiff relies heavily on evidence regarding the existence of a corporate resolution passed by Baypack Fisheries that states that the company will pay defendant first from the proceeds of the Nelbro litigation; he argues that such a resolution should suffice to satisfy defendant. However, the corporate resolution itself is not in the record. Even assuming its existence, and that it does in fact state that the

company will pay defendant first out of any recovery in the litigation, it is no help to plaintiff. The corporate resolution does not purport to give plaintiff any rights to the proceeds of the litigation, nor does it purport to be irrevocable. That is, the company could resolve at any time *not* to pay defendant first from the proceeds.

In sum, plaintiff could not grant defendant a security interest in his right to any recovery from the Nelbro litigation because he had no such right. Thus, neither at the time of the execution of the settlement agreement, nor at any time during the course of the trial, could plaintiff perform his obligations under the agreement. For that reason, he cannot ask a court to require defendant specifically to perform defendant's obligations under the parties' agreement.

■ ■   To obtain specific performance, a party must be ready, willing, and able to perform his own obligations. As the Washington Supreme Court has explained:

> "It is a fundamental doctrine of courts of equity that neither party to a contract will be permitted to enforce it specifically against the other, until he has shown that he has done, or offered to do, or is ready and willing to do, every material act or thing required of him by the agreement at the time of commencing the action, and also that he is ready and willing to do all acts required of him in the execution of the contract in accordance with its terms and conditions. * * * And this doctrine is but the application of the maxim, 'He who seeks equity must do equity.' "

*Wintermute v. Carner*, 8 Wash 585, 587-88, 36 P 490, 491 (1894). To support that proposition, the court cited section 323 of Pomeroy's *Treatise on the Specific Performance of Contracts As It Is Enforced by Courts of Equitable Jurisdiction in the United States of America.* In section 330 of that treatise, Pomeroy observes:

> "The party seeking aid of the court * * * must not only show that he has complied with the terms, so far as they can and ought to be complied with, at the commencement of the suit; he must also show that he is able, ready and willing to do those other future acts which the contract stipulates for as a part of its specific performance."

John Norton Pomeroy, *A Treatise on the Specific Performance of Contracts As It Is Enforced by Courts of Equitable Jurisdiction in the United States of America* § 330, 726 (3d ed 1926). Thus, it is well settled that a plaintiff cannot obtain specific performance unless he is able to comply with the terms of the contract on which he relies. *Coonrod v. Studebaker*, 53 Wash 32, 36-37, 101 P 489, 490-91 (1909); *accord Percy v. Miller et al.*, 197 Or 230, 239-40, 251 P2d 463 (1952) ("[A] plaintiff coming into equity for specific performance must show not only that he has a valid, legally enforceable contract, but also that * * * he is ready, able, and willing to perform his obligations under the contract, in their entirety * * *."); *Voin v. Szabo*, 139 Or App 590, 593-94, 913 P2d 717 (1996), *rev dismissed as improvidently allowed*, 325 Or 247 (1997) (same); *Specific Performance*, 81A CJS 253 § 79 (2004); *Specific Performance*, 71 Am Jur 2d 81-82 § 77 (2001).

Here, although he may be willing, plaintiff is neither ready nor able to grant defendant a security interest in his right to any recovery in the Nelbro litigation. Plaintiff testified at trial, and reiterated in his brief to us, that he has "always been ready, willing and able to perform" his obligations under the settlement agreement. However, as discussed above, the record shows that plaintiff was unable to perform because he had no rights in the collateral in which he promised to grant defendant a security interest. Because plaintiff is unable to uphold his end of the bargain, a court cannot order defendant to specifically perform his obligations.

Affirmed.